UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

JONATHAN SCHWARTZ,

                                        Plaintiff,                    17-CV-04124 (SN)

                    -against-                                        OPINION AND ORDER

SENSEI, LLC d/b/a KAVIVA, et al.,

                                        Defendants.

----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

        Plaintiff initiated this case in June 2017, naming Sensei, LLC d/b/a/ Kaviva ("Sensei" or

"the Company"), as the sole Defendant. Plaintiff amended the complaint twice, once in February

2019, and again in September 2019, to add Defendants Sean McDevitt ("McDevitt"), Alexander

Eric Furer ("Furer"), and Odeon Capital Group ("Odeon"). ECF Nos. 56, 117. After adding non-

diverse Defendant Odeon, Plaintiff alleged federal claims for the first time. All Defendants

moved to dismiss the Second Amended Complaint (the "SAC"), ECF No. 117. See ECF Nos.

121, 123, 126. In February 2020, Sensei consented to entry of default and its motion to dismiss

was therefore denied as moot. ECF No. 145. Before the Court are Defendant Odeon's motion to

dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and

Furer and McDevitt's (together, the "Individual Defendants") motion to dismiss pursuant to Rule

12(b)(6). For the reasons stated below, the Court grants both motions.

**BACKGROUND**

I.     **Factual Background**

The following facts are taken from the SAC and appended documents, of which the Court may take judicial notice. See Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 67 (2d Cir. 1998). Plaintiff Jonathan Schwartz has been working in the financial industry for his more than 20-year career. During his career, he developed a global network and established personal and business connections with investors and investment capital firms around the world. In or about September 2015, Schwartz was introduced to McDevitt through a mutual colleague. McDevitt was the Chief Executive Officer ("CEO") of Sensei, a Florida-based software development company. At the time, McDevitt and the Company were actively seeking investors. Schwartz explained that he had extensive contacts in the finance industry and was willing to "tap into his connections" to identify an investor in exchange for a fee. SAC ¶ 63.

McDevitt and Schwartz executed a Finder's Fee Agreement (the "Finder's Agreement") with an effective date of November 6, 2015. See Finder's Agreement, SAC Ex. 1. The Finder's Agreement provides, in relevant part, that if a third party identified by Schwartz invests in Sensei or if a third party introduces other parties who invest in Sensei, then Schwartz is entitled to a fee equal to 7% of the amount of the investment.

On September 23, 2016, Schwartz wrote an email to McDevitt and Furer, the Company's Chief Financial Officer ("CFO"), saying that he was "getting a lot of questions about the hypergrowth, from 800k to 10mm in 12-18 months, with requests to see the revenue #s month to month, or at least quarter by quarter." McDevitt and Furer responded that a Company board member was "deeply connected" with the Teamsters Union who had signed a deal with the Company and that the Company was actively signing up users across the country. Schwartz

2

asked for confirmation of this deal in writing and for McDevitt and Furer to represent how many contracts or clients had been "signed." On November 2, 2016, Furer responded to Schwartz, copying McDevitt, stating that the Company had five clients signed, including an insurance company representing 1.4 million members, a union representing over 2 million members, and a large educational hospital. Furer also stated that the Company forecasted an average of $1 per employee per month ("PEPM") for most clients, but that "very, very large health plans will likely get a significant discount . . . . Generally, we are on a sliding scale with clients paying us between $1.65 . . . and $0.85."  While the Finder Agreement has an effective date of November 6, 2015, it in fact was not signed until sometime after September 23, 2016.  SAC ¶ 66.

Schwartz endeavored to identify an investor who might be interested in Sensei. In March 2016 – before any representation had been made to Schwartz regarding Sensei's current and prospective clients – Schwartz contacted Odeon Capital Group, LLC ("Odeon"), an investment banking entity. Odeon indicated to Schwartz that it was interested in meeting with Sensei to discuss investing. On March 7, 2016, Schwartz emailed Andrew Feldschreiber, a Managing Director at Odeon, asking if he would be interested in the Company. Schwartz wrote that Sensei was "claiming to go from ~10k in revs, to ~$10mm, in 12-18 months. so, take a look. Maybe it's real. Can [I] send it over?" Feldschreiber responded, "Yes, Will take a look." Later that month, Schwartz wrote to Feldschreiber again, to inform him that the CEO of Sensei, McDevitt, was in town that week and was interested in meeting. "If half of what they tell me is true," Schwartz wrote, "you should go talk to him for 10 minutes." Feldschreiber responded that he would reach out to McDevitt and, the next day, Schwartz sent Feldschreiber McDevitt's contact information and said he would pass Feldschreiber's information on to McDevitt, too. The next day,

Feldschreiber sent an email to Schwartz confirming that he had met with McDevitt and had a "great meeting." He thanked Schwartz for setting the meeting up. See SAC, Ex. B.

Shortly after this initial meeting, McDevitt, Feldschrieber, and possibly Furer met again in Atlanta, Georgia. Schwartz was not present at the meeting. Sensei and Odeon signed an agreement dated May 10, 2016 (the "Odeon Agreement"), providing that Sensei was retaining Odeon as a financial advisor to provide services including identifying and contacting potential investors. See SAC, Ex. C. The Odeon Agreement stated that the Company "has been involved in discussions with financing groups and individuals prior to this agreement" and Odeon acknowledged "that no cash fee shall be due Odeon if those groups or individuals provide capital to the company." McDevitt did not inform Schwartz of the existence of the Odeon Agreement.

In August 2016, McDevitt responded to an email from Schwartz, saying: "I am fine with 7% on the first $2mm, regardless of where it comes from. If an additional $4 or $5mm is raised through Odeon, a 7% cash fee on top of the fee I am paying Odeon is really rich." McDevitt went on to ask whether Schwartz would be amenable to "a good-sized portion of that fee to be paid in equity." See SAC, Ex. D.

On or about January 10, 2017, one of Odeon's clients, KLS Diversified Master Fund, L.P. ("KLS") made a $2 million investment in Sensei. Without Schwartz's knowledge, Sensei paid Odeon $140,000 – an amount equal to 7% of the investment – in cash. About three days later, Schwartz emailed McDevitt and Furer, congratulating them on having raised the first $2 million and stating that, as the parties had "discussed, emailed, texted and signed an agreement to," Schwartz was due a 7% fee. McDevitt did not respond to Schwartz's email.

On February 9, 2017, Schwartz's former attorneys wrote to McDevitt, advising him that the Company was bound to the Finder's Agreement, that Schwartz had introduced the Company

4

to Odeon, that Odeon had consummated a $2 million investment in the Company, and that Schwartz had demanded a 7% commission on the investment. Schwartz's attorneys wrote that the Company had refused to compensate Schwartz and that this failure to pay triggered a breach of the Finder's agreement, entitling Schwartz under the Agreement's terms to additional relief of 15% of the $2 million investment. See SAC, Ex. E.

The Company's attorneys responded to the February 9, 2017 letter. Sensei's attorneys stated that the Company considered Schwartz to be an unregistered Broker Dealer and that, even if Schwartz had performed services entitling him to compensation under the terms of the Finder's Agreement, they would not pay the commission because doing so would violate Securities Exchange Commission ("SEC") rules. See SAC, Ex. F. McDevitt later claimed that Schwartz was not paid a commission because a registered broker-dealer, not Schwartz, had introduced the Company to Odeon.

## II.    Procedural Background

Plaintiff filed his complaint in June 2017, naming Sensei as the only Defendant. On September 27, 2017, the Honorable Robert W. Sweet entered a default judgment against Defendant Sensei. See ECF No. 21. The default judgment was later vacated and, in April 2018, this case was referred to me for settlement. See ECF No. 42. The parties agreed to a settlement and in September of 2018 the case was dismissed with prejudice. ECF No. 46. The settlement broke down, though, and in February 2019, the case was restored to the Court's calendar. ECF No. 55.

Plaintiff filed an amended complaint (the "FAC"), ECF No. 68, adding McDevitt, Furer, and Odeon as Defendants. The FAC did not assert any federal claims. At an initial pretrial conference, Defendants alerted the Court that Odeon was a non-diverse Defendant and that the

Court therefore lacked diversity jurisdiction. <u>See</u> ECF No. 107. Plaintiff argued in response that the Court had federal question jurisdiction because Defendants argued that the underlying contract was null and void under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). The Court granted Plaintiff leave to amend the complaint to include a federal question.

The SAC was filed on September 3, 2019, adding claims under the Exchange Act. ECF No. 117. All Defendants moved to dismiss. ECF Nos. 121, 123, 126. On February 14, 2020, the Court entered a default against Sensei on Sensei's consent and denied its motion to dismiss as moot. ECF No. 145.

## DISCUSSION

The SAC alleges 12 counts: seven against Sensei, McDevitt and Furer; one against Odeon; and four against all Defendants. As described above, Sensei's motion to dismiss has been denied as moot. Accordingly, before the Court are Individual Defendants' motion to dismiss for failure to state a claim, pursuant to Rule 12(b)(6), and Odeon's motion to dismiss for lack of subject matter jurisdiction and failure to state a claim, pursuant to Rules 12(b)(1) and 12(b)(6).

## I.     Legal Standard for Motion to Dismiss

### A.  Rule 12(b)(1)

A district court must dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) when it lacks the statutory or constitutional power to adjudicate it. <u>Markova v. U.S.</u>, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). A plaintiff asserting subject matter jurisdiction has the burden of proving that it exists by a preponderance of the evidence. <u>Id.</u> (citing <u>Malik v. Meissner</u>, 82 F.3d 560, 562 (2d Cir. 1996)).

**B. Rule 12(b)(1)**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must take "factual allegations [in the complaint] to be true and draw[] all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). A court must evaluate whether the complaint "contain[s] sufficient factual matter, accepted as true to state a claim to relief that is plausible on its face." New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 119 (2d Cir. 2013) (quoting Ashcroft v. Iqbal, 550 U.S. 544, 570 (2007)) (internal quotation marks and citation omitted). To set forth a plausible claim, a pleading must "contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (emphasis in original).

**II.    Subject Matter Jurisdiction**

**A. Subject Matter Jurisdiction Over Claims Against Odeon**

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Morrison v. Nat'l Aust. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247 (2010) (quoting Ash v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008)). Odeon argues that the Court lacks subject matter jurisdiction over it because it is non-diverse and Plaintiff does not assert any federal claims against it. The Court agrees.

### 1. Diversity Jurisdiction

Both Plaintiff and Odeon are New York citizens. Plaintiff's citizenship for diversity purposes is not disputed. See SAC ¶ 26. "[A] corporation is a citizen of the state in which it has its principal place of business and every state in which it has been incorporated." Washington Nat'l Ins. Co. v. OBEX Grp. LLC, 958 F.3d 126, 133 (2d Cir. 2020). The SAC alleges that Odeon is "is a New York corporation, organized and incorporated in Delaware, with an address at 750 Lexington Avenue, 27th Floor, New York, NY 10022." Odeon is a citizen of both Delaware and New York. Section 1332 provides that diversity jurisdiction exists over civil actions: (1) between "citizens of different states" and (2) "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(1),(2); Herrick Co. v. SCS Commc'ns, Inc., 251 F.3d 315, 322 (2d Cir. 2001). Diversity jurisdiction requires that all parties to a litigation be completely diverse; all plaintiffs must be citizens of states diverse from all defendants. Van Buskirk v. United Grp. of Cos., Inc., 935 F.3d 49, 53 (2d Cir. 2019) (citing Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., 772 F.3d 111, 118 (2d Cir. 2014)). Because Plaintiff and Odeon are citizens of the same state, the Court lacks diversity jurisdiction.

Plaintiff argues that Defendants, including Odeon, waived their right to object to subject matter jurisdiction by consenting to proceed before a magistrate judge. See Pl.'s Opp. 10-11. The consent to which Plaintiff refers was not related to subject matter jurisdiction but rather to the assignment of this case to a magistrate judge pursuant to 28 U.S.C. § 636(c)(2). In any case, "[s]ubject matter jurisdiction can never be waived or forfeited" and objections "may be resurrected at any point in the litigation." Gonzalez v. Thaler, 565 U.S. 134, 141 (2012). Odeon did not and could not have waived its right to object to the Court's subject matter jurisdiction.

### 2. Federal Question Jurisdiction

Because there is not diversity jurisdiction, for subject matter jurisdiction to exist, the dispute must involve a federal question. See Perpetual Secs. v. Tang, 290 F.3d 132, 136-37 (2d Cir. 2002). Plaintiff's federal claims pursuant to the Exchange Act are not asserted against Odeon. Indeed, Plaintiff asserts only state-law claims —for unjust enrichment, estoppel, tortious interference, civil conspiracy, constructive fraud, and fraudulent conveyance— against Odeon. Accordingly, there is no original federal jurisdiction over Odeon. To have jurisdiction over the claims against Odeon, the Court would have to exercise supplemental jurisdiction. See Jerry Kubecka, Inc. v. Avellino, 898 F. Supp. 963, 972 (E.D.N.Y. 1995).

"In general, 'in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III.'" F5 Capital v. Pappas, 856 F.3d 61, 77 (2d Cir. 2017) (quoting 28 U.S.C. § 1367(a)). Claims are part of the same "case or controversy" if they derive from a "common nucleus of operative fact." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011). "Put differently, the question at hand is whether the relationship between the federal and state claims is 'such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding.'" LaChapelle v. Torres, 37 F. Supp. 3d 672, 680 (S.D.N.Y. 2014) (quoting Montefiore Med. Ctr. v. Teamsters Local 272, 642 F.3d 321, 332 (2d Cir. 2011)).

The Tenth cause of action against Odeon for tortious interference with economic advantage and with contract does not share a common nucleus of operative fact with Plaintiff's federal claims. There is no suggestion that the interference with contract, which allegedly occurred after Plaintiff entered the Finder's Agreement, relates in any way to statements made by

Sensei and the Individual Defendants that purportedly violated the Exchange Act. Moreover, the evidence needed to substantiate Plaintiff's federal claims will not overlap at all with evidence tending to show whether Odeon tortiously interfered with Plaintiff's economic advantage and contract. See id. at 683-84. This claim falls outside the Court's supplemental jurisdiction.

As they relate to Odeon, Plaintiff's Eighth, Ninth, Eleventh, and Twelfth causes of action for unjust enrichment, estoppel, civil conspiracy and constructive fraud, and fraudulent conveyance also do not share a common nucleus of operative fact with the federal claims. These common law claims arise from conduct that occurred well after the representations alleged to have violated the Exchange Act. The federal claims are therefore distinct "both in time and in substance" from the state law claims against Odeon. See id.; see also Bray v. City of New York, 356 F. Supp. 2d 277, 283 (S.D.N.Y. 2004) (no common nucleus of operative fact where state and federal claims involved conduct taking place at different times). Accordingly, the Court lacks supplemental jurisdiction over any of Plaintiff's claims against Odeon.

Because the Court has neither original nor supplemental jurisdiction over the causes of action relating to Odeon, Odeon's motion to dismiss pursuant to Rule 12(b)(1) is granted.

**B.  Subject Matter Jurisdiction Over Claims Against the Individual Defendants**

The Court has diversity jurisdiction over the claims against the Individual Defendants. McDevitt is domiciled in Texas and Florida. SAC ¶ 28. Furer is domiciled in Connecticut. Id. ¶ 29. The Individual Defendants do not dispute that they are citizens of states diverse from Plaintiff. See Pacho v. Enter. Rent-A-Car, 510 F. Supp. 2d 331, 333 (S.D.N.Y. 2007) (an individual is a citizen of the state where he is domiciled). The amount in controversy in this case is not less than $440,000. Accordingly, the Court has diversity jurisdiction over the claims against the Individual Defendants. 28 U.S.C. § 1332(a).

## III.    Securities Exchange Act of 1934

Counts I and II of the SAC allege that Sensei and the Individual Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. SAC ¶¶ 169-86.[1] Count I alleges that the  Defendants made materially false statements that inflated Sensei's valuation, and that Plaintiff relied upon those statements in deciding to enter into the Finder's Agreement. Count II alleges that Sensei and the Individual Defendants are "controlling persons" within the meaning of Section 20(a) of the Exchange Act. Because Sensei's motion to dismiss has already been denied as moot, the Court addresses Plaintiff's claims against only the Individual Defendants.

### A.  Rule 10b-5

#### 1.   Standing to Assert a Claim under Rule 10b-5

The Individual Defendants argue that Plaintiff lacks standing to sue under Rule 10b-5. The Supreme Court long ago held that Rule 10b-5 creates an implied private right of action for claims of securities fraud. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730-32 (1975). That right, however, is limited: only an actual purchaser or seller of securities has standing to assert such a cause of action. Id.

Plaintiff argues that he meets this standard because the Exchange Act's definition of "purchase" is sufficiently broad to include the type of Finder's Fee agreement at issue here. To be sure, the Court in Blue Chip Stamps noted that the Exchange Act defined "purchase" and "sale" broadly enough to include contracts to purchase or sell.  421 U.S. at 750-51. But to show

---

[1] Section 10(b) of the Exchange Act prohibits the use of any "manipulative or deceptive device or contrivance" in contravention of rules prescribed by the SEC "in connection with the purchase or sale" of any security. The claim for fraud therefore arises under Rule 10b-5 (which the SEC prescribed under authority of Section 10(b)). The control-person claim under Section 20(a) of the Exchange Act is discussed below.

that the alleged fraudulent conduct has the requisite connection to the purchase or sale of a security, one must show that the alleged fraud and the securities transaction "coincide." Securities and Exchange Commission v. Zandford, 535 U.S. 813, 823-25 (2002).

The Plaintiff argues that the Individual Defendants fraudulently induced him to sign the Finder's Agreement, that the Finder's Agreement contemplated compensating him with equity warrants if he identified a party that invested more than $2 million into Sensei, and that therefore – despite that no investment of that amount was made, and so he is not even arguably entitled to receive equity warrants – the Finder's Agreement amounts to a contract for the "purchase of securities" that gives him standing to sue under Rule 10b-5. The Individual Defendants argue that the Finder's Agreement is not a contract made in connection with the purchase of securities because Plaintiff admits that he is not seeking equity warrants as damages, and, more generally, that a finder does not have standing to sue under Rule 10b-5.

The parties cite only vintage case law to support their respective arguments about the scope of Rule 10b-5's "in connection with the purchase or sale of any security" requirement. Plaintiff relies on Hoff v. Sprayregen, 339 F. Supp. 369 (S.D.N.Y. 1971), and the Individual Defendants rely on Niederhoffer et al. v. Telstat Systems Inc., 436 F. Supp. 180 (S.D.N.Y. 1977). Neither party cites, much less discusses, the decisions of the United States Supreme Court in Zandford, supra, or in Wharf (Holdings) Ltd. v. United Intern. Holdings, Inc., 532 U.S. 588 (2001). Does a contract that provides for payment partially in securities satisfy the in-connection-with requirement even if the condition for equity payment never arises?  Does the fact that a third party – Odeon – entered into a securities transaction contemplated by a Finder's Agreement affect the analysis? The Court needs to decide these issues.

In any event, even assuming that the in-connection-with requirement was satisfied because the SAC asserts that Plaintiff was fraudulently induced into entering into what was essentially an option agreement and that the fraud therefore coincided with a securities purchase as in Wharf (Holdings), the 10b-5 claim must be dismissed because the SAC fails plausibly to allege that claim.[2]

### 2. Plaintiff Fails to State a Claim Under Section 10(b)(5)

In order to state a claim under Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." City of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 129 F. Supp. 3d 48, 65 (S.D.N.Y. 2015). Plaintiff has failed to state such a claim because the SAC does not adequately allege materiality, reliance, or loss causation.

Plaintiff asserts that the Individual Defendants made false statements regarding the number of Sensei's existing and prospective clients. But the allegations that these alleged falsehoods were material is conclusory. The SAC fails to allege other facts that could support the conclusion that there was "a substantial likelihood" that a "reasonable investor" would have viewed the allegedly false statements – almost all of which were forward-looking projections – "as having significantly altered the total mix of information made available" about Sensei. Basic Inc. v. Levinson, 485 U. S. 224, 231-32 (1988). Moreover, although the test of materiality is objective (id.), it is telling that the Plaintiff plainly was not concerned with the accuracy of

---

[2] The 10b-5 claim is pleaded in paragraphs 1 through 180 of the SAC. Plaintiff does not allege that the Individual Defendants did not intend to honor the Finder's Agreement at the time it was entered into until paragraph 240 of the SAC in a cause of action alleging a state-law claim.

information he had received about Sensei. <u>See</u> SAC ¶ 79 ("they're claiming to go from [approximately] 10k in revs, to [approximately] $10 mm, in 12-18 months. [S]o, take a look. <u>Maybe it's real</u>") (emphasis added); <u>id</u>. ¶ 81 ("The CEO of Sensei is in town this week, and would love to meet you. <u>If half of what they tell me is true</u>, you should talk to him for 10 minutes.") (emphasis in original). Perhaps more fundamentally, the SAC states that the parties entered in the Finder's Agreement in November 2015. SAC ¶ 65. That is well <u>before</u> Plaintiff alleges that Defendants made fraudulent statements to him about Sensei's performance and prospects. <u>See</u> SAC ¶¶ 66-69 (alleging false statements made and misleading materials provided to Plaintiff between September and November 2016).

A false statement cannot induce a purchase of securities if the purchase is made before the statements are. It follows that Plaintiff has failed to allege reliance adequately. In any event, it is clear from Plaintiff's emails quoted above that he was not relying on the Individual Defendants' statements regarding Sensei's current and prospective clients. And Plaintiff concedes that he "was not obligated to – and in fact did not – sell, market or advertise the Company's securities." SAC ¶ 75. His only interest was making an introduction, in the hope that someone he found would evaluate Sensei's securities and make an investment that would trigger a finder's fee. Thus, Plaintiff actively downplayed and discounted the information he had received, SAC ¶¶ 79, 81, and instead stressed to his contact at Odeon that McDevitt had been a banker at Goldman Sachs. <u>Id</u>. ¶ 81. That is not a plausible allegation of reliance.[3]

---

[3] Given the fatal deficiencies in pleading the essential element of reliance, no point is served analyzing in depth whether Plaintiff adequately alleged that the Individual Defendants' <u>scienter</u>. Plaintiff's argumentative allegations about the content of the purportedly fraudulent statements, <u>see</u> SAC ¶¶ 70-71, and his conclusory assertion that the statements were not forward-looking, <u>id</u>. ¶ 163, do not fairly reflect the statements contained in the key email. In that email, the Individual Defendants' discussion of the five contracts makes clear that one was a "pilot" program, the second involved "a few thousand" potential clients, the third was an agreement with one union with 30,000 members, the fourth stated only that the company "expect[ed]" to have an agreement in place by the end of the year, and the fifth described a

Finally, Plaintiff has failed plausibly to allege loss causation. His theory is that he was responsible for identifying the party that invested in Sensei, that that party invested $2 million in Sensei, and that, as a result, he earned his $140,000 finder's fee. Although he insists that he was defrauded into signing the Finder's Agreement, Plaintiff seeks payment of the fee under that very agreement. See SAC ¶¶ 197-210 (asserting that Individual Defendants are liable under the Finder's Agreement). In other words, even assuming for the sake of argument that the Individual Defendants fraudulently induced Plaintiff to enter into the Finder's Agreement, Plaintiff has not and could not plausibly allege that such fraud caused his alleged damages. Plaintiff claims that he was damaged because the Individual Defendants failed to pay him the $140,000 he was owed under the Finder's Agreement. He has failed to allege that the purported securities fraud was the "proximate cause" of his damages. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005). Count I of the SAC is dismissed.

### B.  Plaintiff Fails to State a Claim Under Section 20(a)

Plaintiff also asserts a claim against Sensei and the Individual Defendants under Section 20(a) of the Exchange Act. Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "Controlling-person liability is a separate inquiry from that of primary liability and provides an alternative basis of culpability." In re Alstom SA, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (internal citation and quotation marks omitted). To establish a prima facie

---

education hospital studying possible solutions to chronic care management. SAC ¶ 69. Nor does the SAC contain factual allegations that would even tend to show that the Individual Defendants possessed the requisite guilty mind when they made them.

case for liability under Section 20(a), a plaintiff must show: "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation.'" Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996), cert. denied, 522 U.S. 812, (1997) (internal quotation marks and citations omitted)); see also In re Alstom SA, 406 F. Supp. 2d at 486. Once a plaintiff makes out a prima facie case of liability under Section 20(a), the burden shifts to defendants to show that they acted in good faith and did not "directly or indirectly induce the acts causing the violation." In re Alsom SA, 406 F. Supp. 2d at 486 (citing 15 U.S.C. § 78t(a) and First Jersey, 101 F.3d at 1473)).

The Court has determined that no viable Section 10(b) or Rule 10b-5 claim exists, and "it is impossible to state a claim for secondary liability under [Section] 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party." Brown v. Hutton Grp., 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) (citations omitted). Accordingly, there is no plausible claim for control person liability under Section 20(a). See Cavello Bay Reinsurance Ltd. v. Stein, 18-cv-11362 (KMK), 2020 WL 1445713, at *9 (S.D.N.Y. Mar. 25, 2020) (citing In re Alstrom SA, 406 F. Supp. 2d at 486)). Count II of the SAC is dismissed.

## IV.    Breach of Finder's Agreement and Non-Circumvention Agreement

Counts IV and V charge Sensei and the Individual Defendants with breach of the Finder's Agreement and the non-circumvention agreement included in the Finder's Agreement. And though Count III alleges "piercing the corporate veil" as a separate cause of action, New York law "does not recognize an independent cause of action to pierce the corporate veil; rather it is an assertion of facts and circumstances which will persuade the court to impose the corporate

obligation on its owners.'" Bd. of Managers of 195 Hudson St. Condo. v. Jeffrey M. Brown

Assocs., Inc., 652 F. Supp. 2d 463, 478 n.10 (S.D.N.Y. 2009) (citing Feitshans v. Kahn, 06-cv-

2125 (SAS), 2006 WL 2714706, at *3 (S.D.N.Y. Sept. 21, 2006)) (internal citation and quotation

marks omitted). Accordingly, although Sensei's motion to dismiss is denied as moot, to address

whether the Individual Defendants are liable the Court must consider the claim that the Company

breached the Finder's Agreement.

### A. Breach of the Finder's Agreement and Non-Circumvention Agreement (Counts III, IV and V)

The claims that Sensei breached the Finder's Agreement and included non-circumvention

agreement are governed by basic principles of contract law. The elements of a breach of contract

claim are: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other

party; and (4) damages." Arakelian v. Omnicare, Inc., 725 F. Supp. 2d 22, 31 (S.D.N.Y. 2010)

(quoting Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000)). Formation of a valid

contract requires "an offer, acceptance, consideration, mutual assent and intent to be bound." Id.

(citing Leibowitz v. Cornell Univ., 584 F.3d 487, 507 (2d Cir. 2009)).

The Individual Defendants do not contest that Plaintiff has stated a claim for Sensei's

breach of the Finder's Agreement, including the non-circumvention agreement. Plaintiff has

alleged that: (1) he and Sensei were bound by the Finder's Agreement; (2) he performed by

introducing Sensei to Odeon who in turn introduced Sensei to an investor; (3) Sensei breached

by failing to pay him a finder's fee upon the investment; and (4) he is owed damages in the

amount of the fee he was owed. Accordingly, without ruling on Sensei's liability, the Court finds

that Plaintiff has stated a plausible claim that Sensei breached the Finder's Agreement.

### B. Piercing the Corporate Veil

While Plaintiff has stated a claim for breach of contract as to Sensei, the Individual

Defendants can be implicated only if Plaintiff alleges facts that justify piercing the corporate

veil. Veil-piercing is a "narrow exception to the doctrine of limited liability for corporate

entities" permitted only under "extraordinary circumstances." EED Holdings v. Palmer Johnson

Acquisition Corp., 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (citing Murray v. Miner, 74 F.3d 402,

404 (2d Cir. 1996)) (internal quotation marks omitted). In general, piercing the corporate veil

requires a two-part showing that: "(i) that the owner exercised complete domination over the

corporation with respect to the transaction at issue; and (ii) that such domination was used to

commit a fraud or wrong that injured the party seeking to pierce the veil." Meadowbrook-

Richman, Inc. v. Associated Fin. Corp., 253 F. Supp. 2d 666, 678 (S.D.N.Y. 2003) (quoting Am.

Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997)). "To avoid dismissal, a

party seeking application of the doctrine must come forward with factual allegations as to both

elements of the veil-piercing claim." EED Holdings, 228 F.R.D. at 512.

Allegations concerning domination are governed by Rule 8(a)'s basic pleading standard,

but allegations concerning the fraud or wrongful element are subject to Rule 9(b)'s heightened

pleading requirements to the extent they allege fraud. See United States ex rel. Raffington v. Bon

Secours Health Sys., Inc., 285 F. Supp. 3d 759, 769 (S.D.N.Y. 2018); Fed. R. Civ. P. 8(a), 9(b).

To determine whether an owner exercised "complete domination," courts consider factors

including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the
> corporate existence, i.e., issuance of stock, election of directors, keeping of
> corporate records and the like, (2) inadequate capitalization, (3) whether funds are
> put in and taken out of the corporation for personal rather than corporate purposes,
> (4) overlap in ownership, officers, directors, and personnel, (5) common office
> space, address and telephone numbers of corporate entities, (6) the amount of

business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991). Though Plaintiff's allegations group the two Individual Defendants together, the Court considers them separately.

### 1. Defendant Furer

Plaintiff has not alleged any facts that demonstrate Furer's complete domination of Sensei. The SAC alleges that Mr. Furer was the "Chief Financial Officer and was responsible for certifying the Company's financials and its ability to finance the contracts into which the Company entered." SAC ¶ 29. But the SAC does not allege that Furer was an owner or majority shareholder of Sensei. Nor does Plaintiff allege that Furer lent to or borrowed money from the Company. Indeed, Plaintiff describes Sensei as a "one-man show," implying that if anyone "dominated" it was McDevitt, the Company's CEO. SAC ¶ 141. Allegations that the "Individual Defendants" dominated the Company do not distinguish Furer from McDevitt; they are conclusory and cannot support Furer's individual liability. See In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) ("[P]urely conclusory allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under the liberal notice pleading standard."). Analysis of the second prong is therefore unnecessary as to Furer.

### 2. Defendant McDevitt

Read in the light most favorable to Plaintiff, Plaintiff has plead facts sufficient to allege McDevitt's domination of Sensei. McDevitt negotiated Plaintiff's fee and signed the Finder's Agreement on behalf of Sensei. SAC ¶¶ 72, 154. Plaintiff alleges that McDevitt was an 80%

owner of the Company with "complete and unfettered control." Id. ¶¶ 129, 143. Plaintiff also alleges that the Company was operated from a "virtual office in Texas where McDevitt was based," that "any activity undertaken by the Company was commenced at the sole discretion, and under the strict supervision and control, of McDevitt," and that McDevitt "engaged in unilateral decisions detrimental to the Company." Id. ¶¶ 131, 133, 135. Plaintiff further claims that McDevitt both invested $3 million of his own money in Sensei and "siphoned money from the company in questionable ways." ¶¶ 34, 144.

But, though Plaintiff has stated a claim that McDevitt had complete domination over Sensei, he fails to plead facts sufficient to allege that McDevitt used his domination to commit a fraud or wrongdoing that harmed Plaintiff. Plaintiff's brief in opposition to the motions to dismiss suggests that McDevitt abused the corporate form by diverting Company funds to render Sensei judgment proof. See Pl.'s Opp. Br. 31-32, ECF No. 130. A claim that a controlling party has stripped corporate assets to render the corporation judgment proof qualifies as a "wrong" justifying veil-piercing. See Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 126 F. Supp. 3d 388, 404 (S.D.N.Y. 2015), aff'd, 716 F. App'x 23 (2d Cir. 2017). But in cases where courts have allowed veil-piercing claims to go forward on this basis on a motion to dismiss, the plaintiff presented particular facts in support. See, e.g., CBF Industria de Gusa S/A v. AMCI Holdings, Inc., 316 F. Supp. 3d 635, 648-50 (S.D.N.Y. 2018) (allegation of undercapitalization supported by description of audit reports); Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 39 F. Supp. 3d 516, 527 (S.D.N.Y. 2014) (noting that plaintiff described asset-siphoning scheme "in substance"); Sec. Inv'r. Prot. Corp. v. Stratton Oakmont, Inc., 234 B.R. 293 (Bankr. S.D.N.Y. 1999) (trustee alleged "numerous instances" and "detail[ed] the procedural means by which" corporate owner granted himself excessive bonuses to hinder creditors' recovery).

By contrast, Plaintiff here merely states that McDevitt "undercapitalized the Company and put the Company in a position, through commitments and obligations he made, in which it could not possibly pay its obligations." SAC ¶ 130. Plaintiff states that the Company "suffered from serious cash-flow issues as a result of being vastly undercapitalized by McDevitt who strenuously tried to keep the Company alive on false promises and fabricated projections." SAC ¶ 39. Plaintiff also alleges that McDevitt knew that the Company was undercapitalized to the point that it could not pay Plaintiff the Finder's Fee. SAC ¶ 154.

This allegation sounds in fraud and mirrors Plaintiff's fraudulent conveyance claim. As such, it is arguably subject to Rule 9(b)'s particularity requirements, which necessitate the pleading of "particularized 'facts that give rise to a strong inference' that defendant [ ] acted with fraudulent intent." EED Holdings, 228 F.R.D. at 512 (quoting Lesavoy v. Lane, 304 F. Supp. 2d 520, 530 (S.D.N.Y. 2004)) (internal quotation marks and citation omitted). Apart from conclusory statements that the Individual Defendants "purposely undercapitalized the company," the SAC contains no facts giving rise to an inference of McDevitt's intent. SAC ¶ 145. But even if the Court applies Rule 8(a)'s more liberal pleading standard, Plaintiff's allegations are too conclusory to survive a motion to dismiss. Plaintiff does not provide any detail about the alleged undercapitalization or McDevitt's effort to render Sensei judgment proof. Plaintiff does not indicate when or how McDevitt caused Sensei to be undercapitalized.

Moreover, given that Plaintiff was purportedly entitled to a percentage of the investment value, it is not clear that Sensei's alleged undercapitalization caused harm to Plaintiff, a prerequisite for veil-piercing. Plaintiff states that the $2 million investment was, "upon information and belief," structured in a "creative way that would purposely frustrate the efforts of creditors including the Plaintiff and undercapitalize the Company rendering it incapable of

paying its obligation under the Finder's Agreement." Id. ¶ 289. But the fact that Odeon was apparently paid out of the $2 million investment renders this claim implausible. That the funds were placed into a blocked account, id. ¶ 99, does not evidence McDevitt's purposeful undercapitalization of Sensei or a nexus between the alleged undercapitalization and the harm resulting from Sensei's alleged failure to perform its obligations. See EED Holdings, 228 F.R.D. at 513. More is required to warrant the extraordinary remedy of veil-piercing. See Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 716 F. App'x 23, 28 (2d Cir. 2017) ("[A] simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil.") (quoting Bonacasa Realty Co., LLC v. Salvatore, 947, 972 N.Y.S.2d 84 (App. Div. 2d Dep't 2013)).

Because the Court declines to pierce the corporate veil, the Individual Defendants cannot be found liable in their individual capacities for breach of the Finder's Agreement, including the non-circumvention agreement. Furer was not a signatory to the contract and even though McDevitt signed the Agreement, Plaintiff has not alleged that McDevitt "inten[ded] to substitute or superadd his personal liability for or to that of his principal." Novak v. Scarborough Alliance Corp., 481 F. Supp. 2d 289, 294 (S.D.N.Y. 2007) (quoting Lerner v. Amalgamated Clothing & Textile Workers Union, 938 F.2d 2, 5 (2d Cir. 1991)). New York law requires "clear and explicit evidence" of such intention to bind an individual to a contract signed on a corporation's behalf. Id.; See also Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 467 F. App'x 4, 11 (2d Cir. 2012) ("A corporate officer who signs on behalf of the corporation is not liable unless he signs as an individual (in addition to signing as the corporate representative)."). Counts IV and V are dismissed.

## V.      Remaining Causes of Action Against Individual Defendants

Plaintiff also brings several common law fraud and equitable claims against the

Individual Defendants: fraud in the inducement (Count VI), quantum meruit (Count VII), unjust

enrichment (Count VIII), estoppel (Count IX), civil conspiracy and constructive fraud (Count

XI), and fraudulent conveyance (Count XII). The Court declines to pierce the corporate veil to

hold the Individual Defendants liable for these purported corporate wrongs, all of which relate to

or mirror the Company's alleged breach of contract. See Akholi v. Macklowe, 17-cv-16 (DAB),

2017 WL 6804076 (S.D.N.Y. Dec. 22, 2017) (declining to pierce corporate veil and dismissing

breach of contract, unjust enrichment, and quantum meruit claims against individual defendant).

### CONCLUSION

For the reasons discussed above, the allegations against Odeon and the Individual

Defendants are dismissed in their entirety. The Court will address the allegations against Sensei

by separate order. The Clerk of Court is respectfully requested to terminate the motions at ECF

Nos. 121 and 126.

**SO ORDERED.**

DATED:        September 30, 2020
              New York, New York

SARAH NETBURN
United States Magistrate Judge